WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Debra M. Kinnex,<br><br>        Plaintiff,<br><br>v.<br><br>Commissioner of Social Security Administration,<br><br>        Defendant. | No. CV-16-8017-PCT-DKD<br><br>**ORDER** |

Debra Kinnex appeals from the Commissioner of Social Security's decision to adopt the Administrative Law Judge's (ALJ) ruling denying her claim for Social Security Disability Insurance benefits and Supplemental Security Income Disability benefits. On appeal, Kinnex argues that she is entitled to benefits because the ALJ incorrectly discounted her treating physician's opinion, incorrectly discounted her testimony, and misapplied the Vocational Expert's testimony. (Doc. 18) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and, with the parties' consent to Magistrate Judge jurisdiction, pursuant to 28 U.S.C. § 636(c). As described below, the Court remands this matter for further proceedings.

**BACKGROUND**

Born in 1957, Kinnex filed applications for Social Security Disability Insurance and Supplemental Security Income benefits alleging a disability onset date of July 12, 2012. (Tr. 213-15, 216-25) She alleged disability from osteoporosis, lumbar

compression fractures, and degenerative disc disease of the lumbar and thoracic spine. (Tr. 21, 211-25, 258-59)  She has an 11th grade education and her past work experience was as a bartender, stock clerk, stock control supervisor, waitress, driver, and office clerk. (Tr. 41, 63-65)

**Medical Evidence[1]**

On June 29, 2012,[2] Kinnex established care with Benjamin H. Venger, M.D., at TriState Pain Institute, to manage her spinal pain, identify the pain generator, and maintain her pain medication. (Tr. at 430)  On physical examination of her lumbosacral spine, Dr. Venger noted trigger points at the upper outer quadrant of the buttocks, bilateral paraspinal muscle tenderness, mild spasm, mild pain with extension or axial loading, and minimal bilateral discomfort with lateral bending. (Tr. 433)  He noted that her range of motion was normal for her age, her paraspinal muscle strength and tone were within normal limits, and her straight leg raise test was bilaterally negative. (Tr. 433-34)  Finally, he noted that Kinnex had a slightly broad-based gait and that she was able to walk without the assistance of an orthosis, could stand without difficulty, and had an upright posture. (Tr. 434)

Subsequently, Kinnex used an over-the-counter lumbar brace without any relief. (Tr. 443)  Accordingly, Dr. Venger fitted her for a specialty lumbar brace and ordered a magnetic resonance imaging (MRI) scan. (Tr. 447)  For the L2 vertebra, MRI imaging showed mild compression deformity of the vertebral body with approximately 30% to 40% loss of vertebral height, some patchy bone marrow edema, and a slight degree of posterior retropulsion.  For the L3 vertebra, MRI imaging showed a mild concave deformity and some patchy bone marrow edema.  Finally, for the L4 vertebra, the MRI showed a moderate compression fracture with approximately 60% loss of vertebral

---

[1] This discussion is limited to the issues raised by Kinnex in this Court.

[2] In May 2012, prior to her alleged onset date, Kinnex presented to the emergency room twice for lower back pain. (Tr. 331-34; 396-97)  Subsequently, she was treated at Riverview Wellness Center where she was referred to Dr. Venger for pain management. (Tr. 620-21)  The ALJ decision stated that Kinnex was also referred for joint complaints and generalized limb pain. (*Compare* Tr. 26 *with* Tr. 430)  This is harmless error.

height, diffuse patchy bone marrow edema, and small subligamentous disk protrusion over the L4-L5 area. (Tr. 450-52)

Subsequently, Dr. Venger performed a vertebroplasty on Kinnex's back at the L2, L3, and L4 vertebrae. (Tr. 462-65) In her first follow-up visit, she stated that her pain was "slowly improving following her procedure" and that she could "ambulat[e] well without any significant pain." (Tr. 467) She also stated that pain medications covered 41-50% of her current discomfort and that her pain level average was 7 out of 10. (Tr. 466). At her second follow-up visit on August 3, 2012, she reported that her pain had improved on the inside of her back but she was experiencing more pain on the outside of her back, that she was careful when standing and walking, and that she could "handle the pain" because of the pain medication. (Tr. 473) She acknowledged a 70-80% pain reduction from her medication and claimed that her pain level was about 8 out of 10. (Tr. at 472)

On August 16, 2012, Kinnex stated that her pain medication covered about 31-40% of her pain, that her daily pain average was 7 out of 10, and reported new pain in her upper lumbar region. (Tr. 482, 484) In response to her report of new myofacial thoracic pain, Dr. Venger performed trigger point injections on her mid- and lower thoracic iliocostalis muscles and ordered updated x-rays. (Tr. 478) The thoracic spine x-ray showed a Schmorl node involving the superior endplate of a lower thoracic vertebral body, no significant wedge compression deformities, very mild degenerative changes, no large osteophytes, and some mild scattered intervertebral disc narrowing. (Tr. 392) The lumbar spine x-ray showed mild compression deformities at L2 and L3, a moderate compression deformity at L4, an approximate vertebral height loss of 50% of L4, no evidence of retropulsion, generalized osteopenia, and mild degenerative changes of facet joints. (Tr. 393)

On August 20, 2012, Kinnex told a health care provider at Riverview Wellness that she thought her vertebroplasty had alleviated her back pain. (Tr. 619)

On September 20, 2012, Kinnex stated that her pain medication covered about 41-50% of her pain and that her daily pain averaged 8 out of 10. (Tr. 494) She reported excruciating pain in her lumbar and sacral spine but relief from the earlier procedures in her thoracic spine. (Tr. 495, 498)

On October 18, 2012, Kinnex stated that her medications had given her 60-70% relief but that her pain is worse. (Tr. 505) She complained of abdominal and lumbar pain and so Dr. Venger performed another set of trigger point injections. (Tr. 502)

On November 21, 2012, Kinnex complained of more back pain but was not sure if her pain was from her back or her kidneys. (Tr. 511) She indicated that her pain medication covered about 61-70% of her pain with an average level of pain at 7 out of 10. (Tr. 510) On December 28, 2012, Kinnex reported that her pain medication covered about 61-70% of her pain and that the pain averaged 5 out of 10. (Tr. 516) On January 24, 2013 and February 22, 2013, she stated that her pain medication covered about 91-100% of her pain and that the pain averaged 6 out of 10. (Tr. 530, 536)

On January 31, 2013,[3] Dr. Venger completed a Residual Functional Capacity Questionnaire. (Tr. 318-19) He stated that Kinnex could sit for 20 minutes at a time for a total of two hours in an eight hour work day and that she would take four or five unscheduled 10-15 minute work breaks per day. (Tr. 318) He stated that she could frequently lift less than 10 pounds and occasionally lift 10 pounds, she would be absent more than four times a month from work, and that she was not a malingerer. (Tr. 319)

The record is not clear that Dr. Venger treated Kinnex between March and May 2013. Documentation of monthly visits resumes in June 2013 and her treatment appears to be only medication management. (Tr. 543) In July 2013, she reported to Dr. Venger that her pain medication covers 71-80% of her pain and that her pain level was "so bad

---

[3] Dr. Venger dated the Questionnaire on "1/31/12." (Tr. 319) Dr. Venger began to treat June 29, 2012, and this form was submitted to the Defendant in March 2013. (Tr. 317) Accordingly, it appears safe to assume that the form was completed on January 31, 2013, and that Dr. Venger simply misdated the form, a frequent typographical error that occurs in the new year. This conclusion is also bolstered by noting that the Questionnaire is a form from Myler Disability and Kinnex hired Brad Myler to represent her in December 2012. (Tr. 122-23)

that even with the medication she [wa]s up 4-5 times a night. She [wa]s not able to sit, stand, or lay down for any length of time." (Tr. 544-45) In August, September, October, November, December 2013 and January, February, March, April, May, June, July, August 2014, Kinnex reported to Dr. Venger that medication covered 61-70% of her pain but she variously reported that her pain levels had either remained the same (August, September October, November, and December 2013; January, May, and August 2014), were slightly worse (April 2014), or worse (February, March, June, and July 2014). (Tr. 544-45, 555-56, 561-62, 568-69, 573-74, 579-80, 585-86, 591-92, 597-98, 627-28, 635-36, 641-42)

In April 2014, Kinnex told Dr. Venger that, due to financial considerations, she was only interested in medication management. (Tr. 565) In May 2014, Dr. Venger completed another Residual Functional Capacity Questionnaire that was essentially identical to the previous Questionnaire he completed. (Tr. 624-25) In July 2014, he performed a medial branch nerve block and she subsequently reported that the procedure had relieved approximately half of her pain. (Tr. 628, 633

**Kinnex Self-Evaluations**

On March 12, 2013, Kinnex filled out a self-evaluation form of her symptoms and limitations. (Tr. 266-73) She stated that she could "not walk too long, sit too long, or stand too long." (Tr. 266) She also stated that she needed a cane to walk around and she acknowledged that the cane had not been prescribed. (Tr. 272) Kinnex filled out a second self-evaluation on August 26, 2013. She described her symptoms in the same way as in her previous self-evaluation and acknowledged that she still did not have a prescription for her cane. (Tr. at 289-96)

**State's Agency Evaluations**

On March 27, 2013, the Commissioner's medical consultants reviewed Kinnex's applications for disability benefits and supplemental income and her medical record, and concluded that she was physically capable of performing work at the light exertional

- 5 -

1  level.[4]  (Tr. at 80-97)  On subsequent review, the medical consultants reviewed her
2  updated medical record and affirmed their earlier conclusion that she was capable of
3  performing work at the light exertional level.  (Tr. 100-121)

**Hearing**

At the administrative hearing, Kinnex testified that she had been working as a bartender and waitress but had to quit working due to her back pain.  (Tr. 44)  She testified that she could sit about an hour per day comfortably and then would have to get up to alleviate the pain.  (Tr. 52)  She testified that she drove herself to the hearing, that her pain woke her up at night, that her pain medication helped but did not completely alleviate the pain, and acknowledged that she had received several injections and procedures.  (Tr. 40, 44, 46)  She confirmed that her pain medication brought her pain down from a 7 or 8 to a 4 or 5 (out of 10).  (Tr. 49)  She testified that she lived with her husband who did all the cooking for her, that she could vacuum with a small vacuum, and could wash dishes standing for twenty minutes at a time before lying down.  (Tr. 54-55)  She also testified that she could go to the store for a quick trip, lift and carry five to ten pounds, and drive up to 30 minutes.  (Tr. 53, 56)  However, she could not dance anymore and spent most of her days lying on the couch watching television and crocheting.  (Tr. 59-60)

The vocational expert (VE), Kathryn Atha, testified that Kinnex would not be able to perform any of her past relevant work if her postural limitations were at "occasional." (Tr. 67)  VE Atha testified that Kinnex had acquired simple clerical skills in her previous work as a stock control supervisor[5] and that these skills could be transferred to sedentary work.  (Tr. 66, 74-75)  VE Atha testified that "[t]here would be no past relevant work that

---

[4] The medical consultants concluded that Dr. Venger's Questionnaire was completed before he had started to treat Kinnex and appear to have used that conclusion to justify discounting his opinion.  As noted earlier, the Court concludes that this was nothing more nefarious than a typographical error.

[5] She originally concluded that Kinnex had acquired transferrable clerical skills from her previous position as an office clerk but, after further testimony from Kinnex, modified her conclusion.  (Tr. 68, 71-74)

- 6 -

would be appropriate with occasional posturals." (Tr. 67) However, with sedentary posturals, there were three positions that would be appropriate: receptionist, appointment clerk, and telephone solicitor. (Tr. at 68-69) However, an employee who needed to sit or stand every 20 to 30 minutes would not be able to work in these positions. (Tr. 75-76)

**Administrative Law Judge Decision**

The ALJ's decision followed the requisite five step process. (Tr. 21-30) First, the ALJ concluded that Kinnex had not engaged in substantial gainful activity since her alleged onset date and that her spine disorder was a severe impairment but it did not meet or medically equal the severity of any of the listed impairments in the Social Security Rules. (Tr. 23-24)

Next, the ALJ concluded that Kinnex had the residual functional capacity ("RFC") to perform sedentary work except that she was limited to occasional postural activities and could only sit for two hours and would then need to stand. (Tr. 24) To justify this RFC, the ALJ reviewed Kinnex's hearing testimony, her self-report, and her medical treatment to conclude that she was not fully credible about her spine disorder. (Tr. 25) Specifically, the ALJ noted that Kinnex's self-report stated that she needed a cane to walk but Dr. Venger's medical records indicated that she did not need assistance to walk. (Tr. 25) The ALJ noted that taking Kinnex's self-described limitations at face value was difficult "in view of the relatively benign medical evidence." (Tr. 25) The ALJ concluded that Kinnex had "not generally received the type of medical treatment that one would expect from a totally disabled individual" and that her "treatment and medications have been relatively effective in controlling [her] symptoms." (Tr. 25) The ALJ further noted that Kinnex had provided inconsistent reports on the severity of her symptoms and the amount of relief she obtained from medication. (Tr. 25)

The ALJ gave little weight to the opinion expressed by Dr. Venger in his two RFC Questionnaires because they were "brief, conclusory, and inadequately supported by the clinical findings." (Tr. 27) Specifically, she noted that "Dr. Venger's own treatment records [did] not document any significant abnormalities" and that, instead, he

1 "apparently relied quite heavily on the subjective report of symptoms and limitations
2 provided by the claimant and seemed to uncritically accept as true most, if not all, of
3 what [Kinnex] reported." (Tr. 27)  In light of the ALJ's conclusion that Kinnex was not
4 fully credible, the ALJ found Dr. Venger's opinion less persuasive. (Tr. 27)

5 The ALJ reviewed the State agency medical consultants' opinion that Kinnex
6 could still perform light work and concluded that Kinnex had more limitations. (Tr. 27-
7 28)  The ALJ adopted VE Atha's testimony that Kinnex could not perform her past
8 relevant work but that she had acquired transferable work skills from her past relevant
9 work and could transfer these skills to jobs that exist in significant numbers in the
10 national economy, namely receptionist, appointment clerk, and telephone solicitor. (Tr.
11 28-29)  Accordingly, the ALJ concluded that Kinnex was not disabled. (Tr. 29-30)

## STANDARD OF REVIEW

This court must affirm the ALJ's findings if they are supported by substantial evidence and are free from reversible error. *Marcia v. Sullivan*, 900 F.2d 172, 174 (9th Cir. 1990).  Substantial evidence is more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In determining whether substantial evidence supports the ALJ's decision, the court considers the record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusions. *Reddick v. Chater,* 157 F.3d 715, 720 (9th Cir. 1988).  The ALJ is responsible for resolving conflicts, ambiguity, and determining credibility. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  Thus, the Court must affirm the ALJ's decision where the evidence considered in its entirety substantially supports it and the decision is free from reversible error. 42 U.S.C. § 405(g); *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989).

*Treating Physician's Opinion.*  The views of treating physicians are accorded great deference – deserving controlling weight, and if not in conflict with the record, can only

be rejected with findings that are supported by clear and convincing reasons based on substantial evidence. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Because treating doctors are employed to cure and have a greater opportunity to know and observe the patient as an individual, their opinions are given greater weight than the opinions of other physicians. *Rodriguez v. Bowen*, 876 F.2d 759 (9th Cir. 1989). If the treating physician's medical opinion is inconsistent with other substantial evidence in the record, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR § 404.1527." SSR 96-2p. These factors include length of treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization and other factors.

*Claimant's Testimony*. An ALJ must engage in a two-step analysis in evaluating the credibility of a claimant's testimony regarding alleged symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). First, the ALJ must determine whether there is objective medical evidence of an underlying impairment that could reasonably be expected to produce the alleged symptoms. *Id*. at 1281. Second, when there is no affirmative evidence suggesting malingering, the ALJ must also set forth "specific, clear and convincing reasons" before it can reject a claimant's testimony about the severity of symptoms. *Id*. at 1283-84. *See Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The clear and convincing standard is the most heightened standard in Social Security Law. *Moore v. Soc. Sec. Admin.*, 278 F.3d 920 (9th Cir. 2002). Once an underlying impairment is verified, an ALJ cannot use a lack of full and objective medical corroboration to reject a claimant's subjective symptoms. *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986), *superseded by statute on other grounds as stated in Bunnell v. Sullivan*, 912 F.2d 1149 (9th Cir.1990). To support a finding that the symptoms are not credible, the ALJ must offer specific findings properly supported by the record in sufficient detail to allow a reviewing court to review the findings for permissible grounds and freedom from arbitrariness. (*Id*.) Moreover, the mere fact that Kinnex engages in some daily activities does not in any way detract from the credibility as to her overall disability, as a claimant

does not need to be "utterly incapacitated" in order to be disabled. *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). Such activities of daily living can only be used to reject a claimant's testimony if those activities actually show that a claimant can work or they are inconsistent with a claimant's testimony regarding what he or she can do. (*Id*.)

## ANALYSIS

On appeal, Kinnex argues that the ALJ improperly discounted Dr. Venger's opinion, improperly discounted her credibility, and misconstrued VE Atha's testimony. (Doc. 18) The Court partially agrees.

For both Dr. Venger's opinion and Kinnex's testimony, the ALJ relied on contrary medical conclusions about the severity of Kinnex's spine disorder and the implications about severity from the type of treatment she received. However, the conclusions that Kinnex's medical records showed "relatively benign" spinal problems without "any significant abnormalities" were not based on the opinions of a medical expert. Similarly, the ALJ concluded that Kinnex's treatment was not indicative of total disability without any expert testimony. Although possibly correct, this is—without more—not a sufficient foundation to justify discounting the opinion of a treating physician.

Next, the ALJ did not find evidence that Kinnex was malingering. Instead, the ALJ found that Kinnex's impairments could reasonably be expected to cause her alleged symptoms but her statements about the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the residual functional capacity assessment. (Tr. 24-25) To support this, the ALJ noted that Kinnex used an un-prescribed cane and contrasted two relatively-pain free months in early 2013 with less successful pain management in subsequent months. However, the ALJ does not explain why a change from 91-100% to 61-70% pain reduction with medication is problematic. Thus, the ALJ did not provide a sufficient explanation to support a finding that Kinnex was not fully credible.

Finally, the ALJ found that Kinnex could transfer the skills from her clerk position and, therefore, she was not disabled. (Tr. 28-29) This conclusion was based on a

confusing and incomplete portion of the VE's testimony that included an interruption by Kinnex to dispute the VE's statements. First, the VE concluded the transferable skills came from one job and, after Kinnex disputed this conclusion, the VE concluded that the skills came from a different job. As Kinnex notes, whether her skills are transferrable could be dispositive to the question of her disability. (Doc. 18 at 16-20)

## REMAND FOR FURTHER PROCEEDINGS

Here, the Court cannot remand for benefits because the ALJ failed to provide legally sufficient reasons for rejecting evidence and it appears that the record has not been fully developed. *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). As described above, the ALJ did not properly explain the reasons for rejecting Kinnex's credibility or for rejecting her treating physician's opinion. Doing so appears to require further development of the record, including, possibly, a medical expert.[6] Accordingly, the best course is to remand for further proceedings.

**IT IS THEREFORE ORDERED** that the final decision of the Commissioner is **VACATED**, and this matter is **REMANDED** to the Commissioner for further proceedings consistent with this Order. The Clerk of the Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that upon remand, the Commissioner will remand the case to an ALJ with instructions to:

1. open the record to obtain:
   a. updated medical records;
   b. functional capacity assessments from Kinnex's treating physicians and/or agency consultative examiners, to the extent appropriate;
   c. updated information from Kinnex, including but not limited to, activities of daily living forms and any relevant third party reports;

---

[6] The record shows that Dr. Venger renewed Kinnex's Percocet prescription at every single appointment but that Kinnex's drug screens were all negative for Percocet. (Tr. 437, 526, 554, 603) Although the Court has no medical expertise, it appears that this discrepancy could impact the ALJ's evaluation of Dr. Venger's opinion and Kinnex's credibility.

- 11 -

      2.    hold a *de novo* hearing that includes testimony from vocational and medical experts, to the extent appropriate; and

      3.    issue a new decision.

Dated this 3rd day of April, 2017.

_____
David K. Duncan
United States Magistrate Judge